Carlota **MARIN-MARQUEZ**

v.

**SECRETARY OF HEALTH, EDUCA-TION AND WELFARE.**

**No. 815-67.**

United States District Court
D. Puerto Rico.

March 7, 1969.

Benicio Sanchez Rivera, San Juan, P. R., for plaintiff.

Candita R. Orlandi, Asst. U. S. Atty., San Juan, P. R., for defendant.

ORDER

FERNANDEZ-BADILLO, District Judge.

This is a civil action commenced by claimant for judicial review of the final decision made by the Secretary of Health, Education and Welfare denying her application for disability insurance benefits described by plaintiff as chronic myositis and neuritis (writer's cramp). Defendant has filed a Motion for Summary Judgment asserting that there is substantial evidence in the record to support the Secretary's decision. Plaintiff opposed said motion and substantiated her opposition with an affidavit alleging among other things that the records will show that six doctors testified of her inability to work, and that therefore, she is 100% disabled as determined by the State Insurance Fund of Puerto Rico. Briefs have been filed by both parties.

The transcript of the record reveals that a hearing was held on April 17, 1967 before Hearing Examiner Jules L. Druss and a decision adverse to plaintiff was rendered on May 31, 1967. A request for review of said decision was denied by the Appeals Council after receiving additional evidence relative to the availability of jobs and a summary of the testimony of Dr. José R. Vigoreaux at a public hearing on May 2, 1967 before the Industrial Commission of Puerto Rico in the case of Carlota Marín Márquez. The medical evidence with the exception of the testimony given by Dr. Fernando Cabrera, psychiatrist, at the Social Security hearing mainly consists of various reports considered by the Industrial Commission of Puerto Rico in reaching its decision whereby Carlota Marín Márquez was declared totally and permanently disabled. This situation explains the Examiner's conclusion "that all of the doctors who expressed an opinion of total and permanent disability did so in connection with claimant's job as a record stenographer or typist, or in connection with her employment as such in the Government of Puerto Rico, or in connection with her retirement therefrom, or with her claim against the State Insurance Fund". (Tr. p. 18) It could not be otherwise. Practically all the medical evidence in the record now before the Court was directed to establishing this woman's capabilities in reference to the claim pending before the State Insurance Fund which was disposed of as aforestated. Claimant was not sent for consultory examination to any doctor in order to widen the medical evidence concerning her physical, and what is more important, her mental condition which is the principal element in this case. The Examiner found that she suffers from conversion reaction which affects her ability to work in her previous employment. (Tr. p. 18) Based on physiological reports presented to the Commonwealth agency where it was debated plaintiff was suffering from an occupational disease, to wit, writer's cramp, the Examiner found that her previous job is beyond her capabilities, and then, disregarding Dr. Cabrera's testimony[1] and lacking any

---

1. Excerpts from Dr. Cabrera's testimony át said hearing are most significant. (Tr. pp. 36–40)

"Q. Now, when a person has anxiety or some physical impairment or pain, isn't it sometimes medically better for them to be occupied in some job so as to forget about the discomforts they're suffering?
A. You are correct. In most of the patients. But some other do not.
Q. Is this patient one of them?
A. That's right.
Q. Why is she so?
A. Because there are certain mechanisms that the patient converts this anxiety into physical symptoms and then there's a secondary gain which is the matter of compensation, the matter of having worked for 31 years in the government as secretary. She developed this condition and she feels unconsciously the right to have a compensation and she has to show time and be examined by multiple physicians, and she has this physical complaints and she unconsciously also she doesn't work, she doesn't have the drive for work.
Q. In other words, she has no motivation for it?
A. She has the motivation to show an illness and the secondary gain.
Q. So as to be excused for work and to get money for it?
A. That's right.
Q. to Attorney: You care to ask the doctor any questions, Mr. Guzmán?
REPRESENTATIVE QUESTIONS DOCTOR
Rep. Doctor, from what you have reported it is evident that you have any reason to believe or suspect that she was malingering during the course of your psychiatric evaluation?
A. I do not. I don't think that she was malingering. I believe that she is a severe neurotic patient with marked conversion reaction." * * *
"Q. Doctor, in terms of degree of disability in your own opinion, which percentage of disability would you assign to this patient and when such percentage existed for the first time, if you can make an estimate in terms of time and degree?
A. Well, if I was the one who settled this matter I believe that some psychoneurosis such as a conversion reaction as incapacitating as a severe psychotic episode or condition and on August 30,

other medical history as to her mental disorder, concluded that because there is no evidence of neurological deficit and no atrophy of the right hand (Tr. p. 18) she can use her hands for other purposes, specifically as file or contact clerk. In discounting the degree of seriousness of this claimant's psychoneurotic disorder, the Hearing Examiner relied only on her physical condition to determine that she is functionally able to engage in substantial and gainful activities. The Hearing Examiner in his decision stated at page 18 of the transcript:

"In view of the fact that bone pathology was negative and that there was no evidence of neurological deficit it is obvious that claimant's impairment is primarily related to her conversion reaction, that this conversion reaction affects her ability to work in *her previous job.* * * * Dr. Cabrera in his testimony reported no atrophy. Thus, it would show that while the claimant cannot use her right hand in typing and stenographic work, she actually can use and uses her hand for other purposes. This being the case, I accept Mr. Senior's testimony that claimant is capable of working as

a file clerk and as a contact clerk, jobs which, with her experience and education, she can easily learn and which exist widely in the economy."

■■ I am aware that even though weight should be given to the findings of the state agency these are not determinative and the true inquiry must be directed to establishing whether the claimant seeking disability insurance benefits under the Social Security Act is unable to engage in substantial and gainful activity by reason of an impairment, physical or mental. Hicks v. Gardner (4th Cir. 1968), 393 F.2d 299; Nelms v. Gardner (6th Cir. 1967) 386 F.2d 971. The Court feels that it needs more evidence concerning plaintiff's mental condition in order to be adequately informed when making such a determination.

The picture of psychoneurosis presented by this claimant should not be dismissed lightly. The assumption on which the vocational consultant based his opinion as to this plaintiff's residual work capabilities was obviously incomplete in that it disregarded the mental disorder involved.[2] When said consultant expressed that the job of babysitting was psychologically impossible for claimant

1965 I felt that this patient was incapacitated 100%.
Q. That was in August 1965? Today is April 1967. Does the condition still exist in the same severity and degree?
A. I imagine so.
Q. So her disability has lasted for over 12 months period in a continuous prolonged period?
A. Yes.
HEARING EXAMINER QUESTIONS DOCTOR
H/E: And how does this conversion reaction manifest itself?
A. Well, a conversion reaction is a psychoneurotic disorder manifests itself many times in different types. The anxiety is manifested in symptoms. It appears with ticks, sometimes with paralysis as is partial in this case.
H/E: I want to know exactly in this case how it manifests itself?
A. With writer's cramp and with sharp pains and with partial paralysis.
"Q. By writer's cramp you mean she can't work, is that all she can't do?
A. Yes, because she's a secretary.

Q. Well, can she do anything else with her hands?
A. Very little really. She has to prove you see, unconsciously, that she is crippled of this hand, and remember that the right hand is the hand that she uses for her daily course and you see a patient with 31 years of experience working as a secretary as her line of work. Also her age, 54, 55 years of age. With this condition and also with the neurological, because you will see several reports here with the procedure of rehabilitation in my opinion is zero."

2. The assumption presented by the Examiner to the Vocational Expert was the following (Tr. pp. 66–67) :
"On the basis of the knowledge that you have of this case, have you formed an opinion as to any residual work capabilities of the claimant assuming that I find that she has the following impairment: A functional incapacity to use her right arm in typing or in writing well. She testified also that she does not use it to dress herself. Now, I

the Examiner answered that he wouldn't consider that "as long as she can't use her right hand. * * * I wouldn't want to trust, have her in the responsibility of carrying a baby in her right arm. She might drop it." (Tr. p. 72)

Evaluating the medical evidence on record the Examiner stated in his decision that Dr. Cabrera testified as to claimant's lack of motivation, her unconscious desire for secondary gain and her lack of drive. Relying on this the Examiner further stated that these matters "cannot be brought about by any doctor, medication or therapy without the positive and active desire, will and cooperation of the claimant." (Tr. p. 18) In Branham v. Gardner [3] (6th Cir. 1967) 383 F.2d 614, 633 the Court had occasion to pass upon a similar question and said:

> "Under ordinary circumstances, a Hearing Examiner's finding that an applicant for disability benefits lacked the motivation to work would be entitled to some weight; but when the applicant is suffering from psychoneurosis, lack of motivation to work is irrelevant. In such an affliction, it is, in itself, one of the symptoms of the disorder from which appellant admittedly suffers."

The foregoing are instances which make manifest the need for further development in this case. The parties are instructed to introduce additional evidence. It should be borne in mind that the most important element in this case is the mental impairment of this claimant. The record before the Court is insufficient. There is not substantial evidence to find either for or against either party.

For these reasons, a rehearing is ordered and the case is remanded for further administrative proceedings consistent with this opinion.

It is so ordered.

---

> said a functional capacity because according to the doctor who was present at this hearing, he testified that he could see no sign of gross atrophy and so far as I can judge, I can see nothing wrong with her hand. Have you formed an opinion?"

3. At pages 617–618 the Court in *Branham* cites the case of Miracle v. Celebreeze, 351 F.2d 361, 376 which quotes an authority in psychiatry saying:
> " 'Now, because this normal type of anxiety can be relieved by suitable work and economic security, a regrettable fallacy has crept into the attitude of doctors and lawyers toward neurosis cases. They see that the patient suffers from anxiety, mistake it for normal worry over his position, and think that he will be cured by work. This not only implies that a neurosis is something akin to laziness, or at least faint reluctance "to do an honest day's work", but confuses the condition with a consciously determined attitude of mind. Even patients themselves have been fooled into believing that work would cure them. *Nothing is further from the truth. A neurosis can be cured only by psychotherapy* * * *.' "